Filed 5/15/26  In re Consuelo G. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re CONSUELO G. et al., Persons Coming Under the Juvenile Court Law. | B349112 (Los Angeles County Super. Ct. No. 24CCJP02394) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. LUCIA G., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Lucia G. (Mother) appeals from the juvenile court's order terminating her parental rights over one-year-old twins Consuelo G. and Pedro G. Mother argues the court abused its discretion in failing to apply the beneficial parental relationship exception to termination of parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Dependency Petition*

On August 1, 2024 the Los Angeles Department of Children and Family Services (Department) filed a dependency petition on behalf of Consuelo and Pedro alleging under Welfare and Institutions Code section 300, subdivision (b)(1),[1] that the twins tested positive for amphetamine and methamphetamine at birth. The petition also alleged, pursuant to subdivisions (b)(1) and (j), that Mother had a history of substance abuse and was a current abuser of methamphetamine, amphetamine, and marijuana, and her almost-two-year-old daughter Isabella G. (the twins' half-

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

sister) had been removed from Mother's care due to substance abuse.[2]

At the jurisdiction hearing on September 13, 2024, the juvenile court sustained the petition, and at the disposition hearing a few weeks later, the court declared Consuelo and Pedro dependents of the court and removed them from Mother's custody.[3]  Mother was granted monitored visitation for a minimum of three times a week for three hours each visit. Mother's case plan included drug and alcohol services, weekly drug testing, parenting classes, and individual counseling.

B.    *The Reunification Period*

After they were born, Consuelo and Pedro spent 19 days in the neonatal intensive care unit.  Upon their discharge, they were placed with Maria M., who was also the caregiver (and now the adoptive parent) of Isabella.  The Department social worker observed "an attachment" between the twins and Maria, and Maria was able to meet the children's needs.  Consuelo and Pedro received occupational therapy through the regional center.

At the outset of the case, Mother enrolled in parenting, domestic violence, and anger management classes.  However, she

---

[2]    Mother's parental rights over Isabella were terminated in March 2024, and Isabella was subsequently adopted by Maria M. Mother also had an older daughter, 10-year-old Heavenly C., who had been placed in a legal guardianship with a maternal uncle.

[3]    Mother informed the Department social worker that the twins were a product of rape and Mother knew only a nickname for the father.  The juvenile court found the Department made due diligence efforts to identify and contact the father, but his whereabouts were unknown.

was terminated from her programs around March 2025 after she stopped attending.  Mother failed to appear for all ordered drug tests between August 2024 and February 2025.  Between August 2024 and March 2025 Mother visited the twins consistently three days per week for three hours each visit.  However, Mother's visits became less consistent in March 2025.  Maria monitored the visits and did not report any concerns.  Mother was "attentive, affectionate, and able to meet [the children's] needs such as feeding, changing their diaper[s], and caring for them."

At the six-month review hearing (§ 366.21, subdivision (e)) held on May 20, 2025, the juvenile court found Mother's progress was not substantial.  The court terminated Mother's reunification services and set the matter for a selection and implementation hearing.

C.    *Mother's Visitation After Termination of Reunification Services*

During June and July 2025, Mother visited the twins only once or twice per week.  Maria continued to monitor visits and stated Mother was "attentive and caring to the children's needs and wants."  Other than the inconsistency in scheduling, Maria had no concerns regarding visitation.  There was a three-week period in August 2025 during which Mother did not visit the children, and Maria stated she did not receive any messages from Mother regarding visits.

The Department reported the twins were thriving in Maria's home.  Maria was "warm and loving" with the children, and she wanted "to provide the children with a loving and stable home environment."  The social worker noted "[i]t is evident that

4

they have all formed a bond with each other." Maria was also interested in ensuring the twins and Isabella had a relationship with Heavenly, whom Maria had invited to the twins' first birthday party.

D.    *The Selection and Implementation Hearing*

On September 16, 2025 the juvenile court held the selection and implementation hearing. Mother testified she visited Consuelo and Pedro consistently three times per week until May 2025. Around that time, Mother lost her housing. She began visiting the twins only twice per week because she did not want them to see her "not showered and properly dressed." She also stated it was harder to find transportation to visits while she was unhoused.

In late August 2025 Mother enrolled in a residential substance abuse program. Mother explained there was a "blackout period" at the beginning of the program, during which she could not have any visits with the twins. However, Mother stated she had two visits with the twins in September 2025.

Mother testified that during visits she played with the twins and talked and sang to them. They responded by clapping, smiling, and reaching their hands out to Mother. Consuelo blew kisses to Mother, and both children put their heads on Mother's chest. They crawled to Mother and waved at her. Consuelo sometimes cried at the end of visits, and at the end of the most recent visit, Pedro acted "very serious."

Mother's counsel argued termination of parental rights would be detrimental to the children because Mother had maintained consistent visitation and the children "have this

5

connection with her." Mother was attentive to the children and took care of their emotional and physical needs during visits.

At the conclusion of the hearing, the juvenile court found by clear and convincing evidence that Consuelo and Pedro were adoptable and it would not be detrimental to terminate Mother's parental rights. The court found Mother's visitation "has been, for the most part, regular since these children were removed from her."[4] However, the court observed that the children had lived with Maria for their entire lives and only had monitored visits three days a week with Mother. The court also found Mother's interpretation of the twins' reactions to her was "more speculative than informative because given their age . . . they reach out to a lot of people who look sympathetic." The court found no exception to adoption applied, and it terminated Mother's parental rights and designated Maria as the prospective adoptive parent.

Mother timely appealed.

---

[4] The minute order for the selection and implementation hearing states that Mother "has not maintained regular visitation with the child." However, "[w]here there is a conflict between the juvenile court's statements in the reporter's transcript and the recitals in the clerk's transcript, we presume the reporter's transcript is the more accurate." (*In re A.C.* (2011) 197 Cal.App.4th 796, 799-800; accord, *Garner v. BNSF Railway Co.* (2024) 98 Cal.App.5th 660, 668.)

**DISCUSSION**

A.    *Governing Law and Standard of Review*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225 (*B.D.*); accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), the parent may avoid termination of parental rights if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.E.* (2023) 91 Cal.App.5th 683, 691.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316-317 (*Katherine J.*).) When determining whether termination of parental rights would be detrimental to the child, courts need to consider "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633; accord, *In re D.P.* (2022) 76 Cal.App.5th 153, 164.)

"'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Caden C., supra*, 11 Cal.5th at p. 633; accord, *Katherine J., supra*, 75 Cal.App.5th at p. 317.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, at p. 630; accord, *In re I.E., supra*, 91 Cal.App.5th at p. 691.)

B.      *The Juvenile Court Did Not Err in Terminating Mother's*
        *Parental Rights*

Mother contends the juvenile court abused its discretion in finding the beneficial parental relationship exception did not apply because the evidence showed the twins had a strong bond with Mother and a continuation of that relationship would be beneficial to them.

As discussed, the juvenile court found Mother had satisfied the first step of the beneficial parental relationship exception analysis by consistently visiting the children.  With respect to the second step, Mother argues the children would benefit from continuing their relationship with her because they smiled and reached out to her, rested their heads on her chest, and crawled to her.  However, the court's finding Mother did not have a substantial, positive, emotional attachment with the children was supported by substantial evidence.  Although the children appeared to enjoy their visits with Mother, there is no evidence they regarded her as anything more than a friendly playmate. The children had never lived with Mother.  While they may have sometimes been unhappy when visits ended, there is no evidence the children had any behavioral changes during the three weeks that they did not see Mother.  That the children sometimes enjoyed spending time with Mother is not sufficient to show they had a substantial emotional attachment to her.  (See *Katherine J., supra*, 75 Cal.App.5th at p. 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"]; *B.D., supra*, 66 Cal.App.5th at p. 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate and [whose]

9

interactions with the parent were not ambivalent, detached, or indifferent"].)

As to the third *Caden C.* factor, the juvenile court did not abuse its discretion in finding the benefit and security provided by the children's placement with Maria outweighed any harm that would be caused by the children's loss of their relationship with Mother. As discussed, the children had been living with Maria almost their entire lives. They had a bond with Maria and were thriving in her home. They were also able to live with one of their half-sisters and maintain a relationship with the other half-sister. Maria ensured the twins received regional center services. On this record, there is no showing of "'exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The court therefore did not abuse its discretion in finding the benefit and security provided by the children's continued placement with Maria as the prospective adoptive parent outweighed any harm that would be caused by the loss of their parental relationship with Mother. (*Id.* at p. 634; *Katherine J., supra*, 75 Cal.App.5th at p. 317.)

## DISPOSITION

The order terminating Mother's parental rights is affirmed.


FEUER, J.

We concur:



SEGAL, Acting P. J.          STONE, J.


10